# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | |
|---|---|
| CYNTHIA LUDWIG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) 3:13-CV-1123 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| COMMISSIONER OF THE | ) |
| SOCIAL SECURITY | ) |
| ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff, Cynthia Ludwig. For the reasons set forth below, the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

## BACKGROUND

On October 8, 2010, the Plaintiff, Cynthia Ludwig ("Ludwig"), filed an application for Disability Insurance

Benefits ("DIB"). (Tr. 133-34.) Ludwig alleged that her disability began November 20, 2009, due to: cervical degenerative disc disease, degenerative joint disease, issues with her left sciatica, pain in her left arm/shoulder/hand/neck, numbness in her left arm/hand, numbness on the left side of her face, problems with her L4-5, an inability to sit for more than fifteen minutes, and lumbar degeneration. (Tr. 24, 155.) The Social Security Administration denied her initial application on February 7, 2011, and also denied her claims on reconsideration on April 13, 2011. (Tr. 73-76; 81-87.) Ludwig filed a written request for hearing on April 28, 2011. (Tr. 88-89.) On March 12, 2012, a video hearing was held before Administrative Law Judge Warnecke Miller (the "ALJ"). (Tr. 37-70.) Ludwig appeared in Elkhart, Indiana, and the ALJ presided over the hearing from Fort Wayne, Indiana. (*Id.*) She was represented by counsel, Matthew D. Talbert. (*Id.*) In addition to Ludwig, Sharon D. Ringenberg, an impartial vocational expert ("VE"), provided testimony at the hearing. (*Id.*) On June 1, 2012, the ALJ denied Ludwig's DIB claim, finding that she was not disabled because she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy, despite her limitations. (Tr. 22-31.)

Ludwig subsequently requested that the Appeals Council review the ALJ's decision, and the request was denied on August

21, 2013. (Tr. 1-7.) Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 404.981. The claimant has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

DISCUSSION

*Facts*[1]

Ludwig was born on January 5, 1962. (Tr. 29.) She has a high school degree, attended college for two years, and is able to communicate in English. (Tr. 29.) In the past fifteen years, Ludwig's relevant work included jobs as a medical records clerk and office manager. (*Id.*; 46-48.) The medical evidence can be summarized as follows:

Prior to her alleged onset date of November 20, 2009, Ludwig went to the Coloma Clinic on February 4, 2009. (Tr. 259-60.) Ludwig was referred from Occupational Health and saw Trevor Portenga, a physician's assistant, for complaints of left hand/arm pain and swelling, coldness and numbness in her left upper extremity and face, and difficulty grasping with left hand. (Tr. 259.) Mr. Portenga diagnosed her with cervical spondylosis and degenerative disc disease resulting in left arm radiculopathy and prescribed Prednisone to reduce swelling.

---

[1] The Court has borrowed liberally from the facts sections of the parties' briefs, as the facts are largely undisputed.

(*Id.*)  On February 5, 2009, Ludwig underwent an MRI of her cervical spine.  (Tr. 230.)  The MRI confirmed: degenerative bony changes with osteophyte formation from C4-5 to C7-T1 and also revealed loss of disc height from C4-5 to C6-7, a diffuse disc bulge which mildly effaced the ventral thecal sac and ventral cervical cord at C4-5, a mildly diffuse disc bulge with small osteophyte formation resulting in effacement of ventral thecal sac at C5-6, a small disc osteophyte complex resulting in effacement of the ventral thecal sac at C6-7, and a left foraminal disc osteophyte complex resulting in narrowing of the left neural foramen at C7-T1.  (*Id.*)  The radiologist, Crystal Darling, M.D., diagnosed cervical spondylosis and multilevel degenerative disc disease.  (Tr. 231.)

On February 19, 2009, Ludwig saw her primary care provider, Joseph H. Cerbin, M.D.  (Tr. 394.)  On examination, Ludwig had a 5/5 motor strength in all muscle groups of upper extremities, and the deep tendon reflexes of her upper extremities were 3+ and symmetric.  (*Id.*)  The range of motion of the cervical spine had some limitation of rotation and lateral flexion of about 25 degrees less than normal bilaterally, but there was no tenderness to palpation, redness, warmth or swelling of the arms.  (*Id.*)  Dr. Cerbin indicated some symptoms of cervical radiculopathy, but he did not understand relationship between swelling of the hand and the other symptoms.  (*Id.*)  Dr. Cerbin

prescribed Mobic, a non-steroidal anti-inflammatory medication, and he suggested consultation with Kathryn L. Park, M.D., a specialist in physical medicine and rehabilitation. (*Id.*)

On March 2, 2009, Ludwig went back to see Mr. Portenga, who noted that her swelling had improved but that she showed some favoritism of the right upper arm. (Tr. 248.) Mr. Portenga documented that Ludwig had been having trouble sleeping at night because of the pain. (*Id.*) He told Ludwig to continue to take Mobic twice a day as well as Flexeril three times a day and to keep the appointment at the University of Michigan regarding cervical spine abnormalities found on the MRI. (*Id.*) Mr. Portenga wanted to speak to Dr. Swanson, a rheumatologist, regarding his diagnostic opinion. (Tr. 249.) On March 20, 2009, Ludwig again visited Mr. Portenga because her left arm was bothering her significantly, and she was having difficulty opening and closing her hand due to pain. (Tr. 247.) Ludwig told Mr. Portenga that any dose of Prednisone less than thirty milligrams did not seem to help her. (*Id.*) He noted that she was in "mild distress" and was very protective of her left arm. (*Id.*) Mr. Portenga started Ludwig on Lyrica, and, based on her responses to the medication, determined that he would send Ludwig to either a rheumatologist or an orthopedic physician. (*Id.*)

On April 2, 2009, Ludwig went to see Kevin G. Drew, M.D., a pain specialist, for an initial consultation. (Tr. 316-18.) Ludwig complained of neck, bilateral shoulder, and left arm pain radiating down her fourth and fifth digits with some numbness and tingling in her first, second and third digits. (Tr. 316.) Ludwig also reported pain in her lower back, her bilateral lower extremities posteriorly down to her knees, and anteriorly in the knees. (*Id*.) Upon examination, Dr. Drew documented the following:

> She is sitting comfortably. She is able to transfer from sit to stand. She is able to ambulate. She does have a left hand with a fourth digit that remains in a flexed position at the PIP joint. This is painful for her to extend. She has a reduced grip strength on the left as compared to the right side. There is decreased sensation in the median distribution in digits 1, 2, and 3. The patient does have a very limited range of motion of her cervical spine and very limited range of motion of her lumbar spine. She complains of pain with any kind of resisted movements, and we did cut the examination short due to her persistent pain.

(Tr. 317.) He diagnosed Ludwig with chronic persistent pain syndrome in her lower back, post-laminectomy syndrome involving the lumbosacral spine status post L4-L5 laminectomy in 1988, bilateral S1 radiculopathy, left C7-C8 radiculopathy, and hypothyroidism. (*Id*.) Dr. Drew prescribed Vicodin Extra Strength for pain control, increased her dosage of Lyrica, and advised her to obtain a left C7-T1 epidural injection. (Tr.

317-18.)  On April 3, 2009, Dr. Drew performed a left C7-T1 cervical epidural injection.  (Tr. 315.)

On April 13, 2009, Dr. Drew reported that the MRI of Ludwig's lumbar spine performed on April 6, 2009, showed evidence of scar tissue around the L4-L5 area and some dark bulging disc at L2-3, L3-4 and L4-5 with hemangiomas at L2 and T12.  (Tr. 314.)  Ludwig reported that the epidural injection from April 3, 2009, gave her one hundred percent relief but that it wore off fairly quickly.  (*Id.*)  Dr. Drew performed another C7-T1 cervical epidural injection with no complications.  (*Id.*)

On April 20, 2009, Ludwig met with Dr. Drew again and reported a thirty percent improvement but still had persistent pain that worsened with most activity and made it difficult to sleep.  (Tr. 313.)  Dr. Drew examined her and noted an antalgic gait, weakness, a limited range of motion and tenderness in the cervical spine, and limited motion in both legs.  (*Id.*)

Ludwig followed up with Dr. Drew on May 26, 2009, and reported neck pain radiating into both shoulders and arms as well as lower back pain radiating into her right lower extremity.  (Tr. 312.)  Dr. Drew again reported antalgic gait, weakness, limited motion in the lumbar spine, tenderness and limited motion in both legs.  (*Id.*)

On June 12, 2009, Ludwig went back to see Dr. Cerbin and reported she was having neck and neuropathic pain.  (Tr. 393.)

Ludwig reported that the neurosurgeons and neurologists she had seen in Michigan had nothing to offer her and the pain pills they prescribed were too expensive. (*Id.*) Ludwig complained of pain in the left shoulder and problems with her fourth finger and occasionally with her fifth finger. (*Id.*) Dr. Cerbin noted a markedly decreased range of motion in the shoulder with positive impingement signs. (*Id.*) Dr. Cerbin noted that Ludwig seemed depressed and recommended that she see a neurosurgeon, but Ludwig refused. (*Id.*) Dr. Cerbin prescribed imipramine for neuropathic pain and exercises for the shoulder impingement. (*Id.*)

On July 10, 2009, Ludwig followed up with Dr. Cerbin and told him her pain was not as unbearable as it was, but she said that it had not gone away. (Tr. 392.) Dr. Cerbin stated that her cervical radiculopathy was not controlled and that the range of motion of the C-spine elicited pain, but he noted that there was no muscular weakness at the time. (*Id.*)

On September 8, 2009, Ludwig returned to Dr. Drew and complained of pain as well as numbness and tingling in her left hand. (Tr. 311.) Ludwig reported that she had discontinued her medications due to the grogginess that made her unable to finish her daily functions. (*Id.*) Dr. Drew noted a normal gait, full motor strength in all extremities, mild pitting edema in Ludwig's hand, limited motion in the lumbar and cervical spines,

tenderness, and intact sensation. (*Id.*) Dr. Drew refilled Ludwig's prescription for Vicodin and suggested she receive another epidural injection. (*Id.*) On September 15, 2009, Ludwig received a left C6-C7 cervical interlaminar epidural. (Tr. 310.) On September 28, 2009, Ludwig followed up with Dr. Drew. (Tr. 309.) Dr. Drew noted her ESI did not improve and documented antalgic gait with weakness and limited range of motion in the lumbar spine. (*Id.*)

On October 19, 2009, Ludwig returned to see Mr. Portenga and acknowledged mixed success with medications and therapies from Dr. Drew, but she had continued complaints of left-sided radiculopathy with cervical disc pathology. (Tr. 245.) Ludwig complained of the left side of her facing feeling numb, which was a new complaint to Mr. Portenga. (*Id.*) On examination, the cranial nerves were intact and the rest of the neurologic exam was unchanged and mostly within normal limits. (*Id.*)

On October 29, 2009, Ludwig met with Dr. Drew to report neck, shoulder, and arm pain along with numbness on the left side of her face. (Tr. 308.) Ludwig also reported being unsure if the medication was helping. (*Id.*) Dr. Drew determined that her gait, muscle strength and range of motion were all normal. (*Id.*)

On November 19, 2009, Ludwig saw Mr. Portenga again and complained that her pain was "so bad that she is having a

tremendous problem sleeping at night." (Tr. 242.) Mr. Portenga assessed Ludwig and noted reflex sympathetic dystrophy, bladder fistula, overactive bladder and insomnia. (*Id.*) Mr. Portenga also reported that, "at this point, I do not know how the patient is functioning at work. Her gait is extremely slow and painful and at this point I do truly agree that maybe a short-term disability for the next two months would be a good idea for her." (*Id.*)

On December 3, 2009, Dr. Drew performed another epidural injection in Ludwig's cervical spine. (Tr. 306.) Dr. Drew noted that her first injection gave her relief but did not last long and that the third injection, performed in September, did nothing. (*Id.*) On December 21, 2009, Ludwig reported to Dr. Drew that she had no relief from the injection and complained of persistent pain. (Tr. 305.) Dr. Drew reported normal gait but noted muscle weakness as well as limited motion in the lumbar spine and lower extremities. (*Id.*) An MRI of her cervical spine was performed on December 23, 2009, showing multilevel degenerative changes with mildly increased disc height loss at C6-7. (Tr. 288-89.) An MRI of her lumbar spine, taken the same day, revealed multilevel degenerative disc disease with evidence of a prior laminectomy, a disc bulge, mild central canal stenosis and slight neuroforaminal narrowing at L4-5. (Tr. 290-91.)

On January 4, 2010, Ludwig returned to Dr. Drew and stated that the Percocet helped but her pain was at a level 8 out of 10 with numbness in her left arm and hand that worsened when she lifted her arm. (Tr. 304.) Dr. Drew observed moderate edema in her hands, an antalgic gait and muscle weakness, and limited motion in the cervical spine, lumbar spine, both arms and both legs. (*Id.*) On February 25, 2010, Ludwig again met with Dr. Drew who documented a normal gait, muscle weakness, and limited motion and tenderness in the lumbar and cervical spines. (Tr. 303.) On March 1, 2010, Dr. Drew administered another lumbar epidural steroid injection. (Tr. 302.) On March 12, 2010, Ludwig reported that the injection helped forty percent for one week and that she no longer had pain radiating down her lower extremity, but she still complained of pain in her lower back. (Tr. 301.) She also reported persistent neck pain and numbness in her left hand. (*Id.*) Dr. Drew documented an antalgic gait, muscle weakness, and limited motion in the lumbar spine and legs. (*Id.*)

On March 30, 2010, because Ludwig had received four cervical epidural injections with little to no success, Dr. Drew implanted a cervical spinal cord stimulator for a trial period to improve Ludwig's symptoms. (Tr. 299.) On April 6, 2010, Ludwig reported to Dr. Drew seventy-five percent relief in her left shoulder and arm after the procedure but complained of pain

in her neck, left arm, lower back, and left lower extremity. (Tr. 298.) Dr. Drew reported edema in her left hand, muscle weakness, tenderness and limited motion in the cervical and lumbar spines. (*Id.*) On April 8, 2010, Dr. Drew implanted a spinal cord stimulator in her lumbar spine for a trial period. (Tr. 296-97.)

On April 12, 2010, Ludwig met with Byung C. Rhee, M.D., a surgeon working at a pain clinic, to whom she had been referred. (Tr. 426-28.) At this appointment it was noted that Ludwig could stand on her heels and toes and squat and recover. (Tr. 427.) Dr. Rhee documented that Ludwig's lower back flexion was limited to sixty percent and her extension was limited to about fifteen degrees but that her lateral bending was full. (*Id.*) Dr. Rhee also reported that Ludwig's neck flexion was limited to fifteen degrees and that she had tenderness in the midline, bilateral paravertebral, and bilateral anterolateral aspect of the neck. (*Id.*) Dr. Rhee's overall impression was lower back pain with lumbar radiculopathy, a history of lumbar laminectomy, neck pain with cervical radiculopathy and cervicogenic headache. (*Id.*) Dr. Rhee recommended proceeding with permanent implantation of the cervical spinal cord stimulator system due to Ludwig's positive reactions to it. (Tr. 427-28.)

On April 15, 2010, Ludwig went back to Dr. Drew and stated she had eighty percent relief in her lower back and legs, but

she still described constant pain that worsened with walking, standing or lifting as well as numbness and tingling in her left hand. (Tr. 295.) Dr. Drew noted a normal gait, normal muscle strength and tenderness and limited motion in the cervical and lumbar spine. (*Id.*)

On April 26, 2010, Ludwig saw Dr. Cerbin and reported continued pain in both her neck and back despite having the epidurals. (Tr. 391.) Ludwig admitted that she did not go to the surgeon when her problem began. (*Id.*) Dr. Cerbin documented pain with active and passive range of motion in the cervical and lumbar spine and referred her to a neurosurgeon for examination, work-up and possible treatment. (*Id.*)

On April 30, 2010, Dr. Rhee performed the implantation of the spinal cord stimulator electrodes and rechargeable pulse generator for permanent use of a cervical spine stimulator. (Tr. 374-376.)

On June 3, 2010, Ludwig saw Stephen M. Smith, M.D., the neurosurgeon she had been referred to, and stated that her biggest problem was her severe neck pain, along with left shoulder and arm pain that radiated down toward the thumb and index finger. (Tr. 323.) Dr. Smith noted that a cervical MRI and MRI of brachial plexus showed multilevel degenerative changes in the cervical spine, but the neural foramina was relatively open at all levels, with a bit of narrowing at C7-T1.

(*Id.*) Upon examination, Dr. Smith noted that Ludwig's motor strength appeared in full in the right upper extremity, that she could heel and toe walk, albeit with pain, and that her range of motion in the cervical spine was stiff with rotation to about thirty degrees to the left and forty degrees to the right. (*Id.*) Dr. Smith further noted that rotation did not produce pain down her arm with a Spurlings maneuver, that she had a good passive range of motion in the shoulder, and that the shoulder did not appear frozen and did not appear to hurt except when she tried to abduct her arm. (*Id.*) Dr. Smith acknowledged that her left deltoid and supraspinatus appeared to be her greatest weakness because she had pain and could not abduct her arm past thirty degrees on the left. (Tr. 324.) Dr. Smith documented diminished sensation in her left thumb and index finger and recommended that she undergo electrical diagnostic studies to determine whether she had brachial plexopathy or cervical radiculopathy. (*Id.*) If the test came back normal, however, he would rule out a diagnosis of cervical radiculopathy. (*Id.*) On June 17, 2010, and June 24, 2010, Ludwig underwent electromyelography and nerve conduction studies of the upper and lower extremities, and the results came back normal with no abnormalities. (Tr. 325-26.) On June 25, 2010, Dr. Rhee performed the permanent implantation of Ludwig's lumbar spinal cord stimulator. (Tr. 414-415.)

On August 20, 2010, Ludwig returned to see Dr. Cerbin who noted that she had numbness in her left face that he believed was unrelated to her spine problem due to examinations showing that her cranial nerves were intact, so he recommended that she see a neurologist. (Tr. 390.) Ludwig was using a back stimulator and taking Ultram at this point. (*Id.*)

On December 11, 2010, Ludwig went to a consultative examination with Mahmoud Kassab, M.D., at the request of the Social Security Administration. (Tr. 429-31.) Ludwig complained of chronic fatigue and muscle aches as well as pain in her neck, back, and arms that got worse with sitting and standing for more than fifteen minutes. (Tr. 429.) Dr. Kassab documented that her grip strength in the left hand was half of that measured in the right hand, that she walked with mild antalgic gait on the left side, and that she had difficulty standing on her heels or toes. (Tr. 429-30.) Dr. Kassab also documented diminished motion in the cervical and lumbar spine. (Tr. 430-31.) On neurological examination, he noted that Ludwig's strength was full, that there was no atrophy, that sensation to light touch was normal, and that deep tendon reflexes were symmetric and normal. (Tr. 430.) Dr. Kassab opined that Ludwig's physical symptoms might stem partly from depression and recommended a psychiatric evaluation. (*Id.*)

On February 1, 2011, Ludwig saw Dr. Drew for a medication refill and for a new onset of pain in her mid-back, as well as constant pain with numbness and tingling in her left hand and face. (Tr. 451.) Dr. Drew noted a normal gait with weakness and tenderness along with a limited range of motion in her cervical and lumbar spines. (*Id.*) Dr. Drew recommended reprogramming the spinal cord stimulator, and he refilled Ludwig's medication. (*Id.*) On February 10, 2011, Ludwig returned to Dr. Drew to discuss her recent x-rays and reported experiencing persistent pain. (Tr. 450.) Dr. Drew documented an antalgic gait, muscle weakness and tenderness, and a limited range of motion in her lumbar spine. (*Id.*) Dr. Drew repeated the recommendation of reprogramming the spinal cord stimulator and told her to consider physical therapy. (*Id.*)

When Ludwig returned to Dr. Drew on November 2, 2011, she complained of back pain radiating to her buttocks on the right and into her foot on the left, as well as pain extending from her left shoulder to her left hand. (Tr. 480.) Dr. Drew noted antalgic gait, muscle weakness, and tenderness and a limited range of motion in her lumbar spine. (*Id.*) He recommended a lumbar epidural injection and refilled her medication. (*Id.*)

On November 8, 2011, Dr. Drew completed a Residual Functional Capacity Questionnaire stating that Ludwig was diagnosed with lumbar and cervical radiculopathy and

degenerative disc disease. (Tr. 481-86.) Dr. Drew noted that
Ludwig could walk less than one block, sit for fifteen minutes,
and stand for 10-15 minutes at a time. (Tr. 483.) In an eight-
hour day she could stand/walk for less than two hours and sit
for about four hours. (Tr. 484.) Dr. Drew noted that Ludwig
would need a job that allowed her to walk around every fifteen
minutes, shift positions at will, and take frequent unscheduled
breaks. (*Id.*) Dr. Drew also stated that while Ludwig could
rarely lift ten pounds and occasionally lift less than ten
pounds, she could never lift twenty pounds or more. (*Id.*) Also,
Dr. Drew noted that she could rarely turn her head in any
direction or hold her head in a static position. (Tr. 484-85.)
Dr. Drew further noted that Ludwig would have difficulty using
her hands and could never reach overhead. (*Id.*) Dr. Drew
stated that Ludwig would likely be absent more than four days
per month due to her impairments. (Tr. 485.)

That same day, Dr. Drew performed a right-sided S1
transforaminal epidural injection. (Tr. 477.) Dr. Drew noted
that Ludwig was relatively pain free in the left lower extremity
but was having more problems in her right lower extremity.
(*Id.*)

Ludwig went to a follow up visit on November 15, 2011, and
reported experiencing significant relief in her right buttocks
and lower extremity but complained of lower back pain radiating

17

into her left lower extremity as well as pain throughout her left upper extremity. (Tr. 476.) Dr. Drew noted moderate edema in the left hand, a normal gait, muscle weakness, tenderness and limited motion in the lumbar spine. (*Id.*)

On December 29, 2011, Ludwig returned to Dr. Drew for a consultation and reported worsening pain which radiated down her left leg and into her right hip, and she indicated that the pain was a seven out of ten but was sometimes as severe as a nine out of ten. (Tr. 475.) Ludwig also reported that the Percocet was not working as well as before and that lately her feet had become severely numb. (*Id.*) Dr. Drew documented antalgic gait, muscle weakness, limited motion in the lumbar spine and both legs, and tenderness. (*Id.*) Dr. Drew increased her dosage of Percocet to alleviate her pain and expressed a desire to order a CT myelogram for further evaluation. (*Id.*)

In April of 2012, Ludwig returned to Dr. Drew and said she could not obtain further imaging studies due to lack of medical insurance. (Tr. 487.) Ludwig complained of neck pain radiating throughout her left upper extremity as well as lower back pain that radiated into both hips and legs down to her ankle on the right side and knee on the left side. (*Id.*) She reported experiencing numbness in her left hand as well as both feet. (*Id.*) Dr. Drew observed mild edema in her left hand, limited

motion in the lumbar and cervical spine, and muscle weakness.
(*Id.*)  He refilled her prescription for Percocet.  (*Id.*)


*Hearing Testimony*

At the hearing on March 12, 2012, Ludwig testified that she
last worked in November of 2009 as a clerk in the medical
records department.  (Tr. 44-46.)  Ludwig testified that she
received short-term disability payments for part of 2010.  (*Id.*)
She stated that she could no longer perform full-time work
because she could not sit for long periods of time without
shifting or standing up, that twisting and bending created pain,
and that she spent more time lying down than in any other
position.  (Tr. 49.)  Ludwig testified that the pain was on the
left side of her neck and ran down her left shoulder to her left
forearm.  (*Id.*)  She also stated that the first three fingers on
her left hand were numb all the time.  (*Id.*)  Ludwig further
testified that she had sharp, constant pain mid-way in her back
that went down the center and into her left hip, making it feel
like it was going to pop out of place.  (Tr. 50.)  Ludwig stated
that if she attempted to do too much, she ended up in bed for
three days with pain.  (Tr. 49.)

According to Ludwig, the cervical stimulator moved, and she
admitted that she had not yet addressed the issue with her
doctors; therefore, while it used to help alleviate her pain, it

no longer provided relief. (Tr. 50.) She further stated that the lumbar stimulator helped the pain about twenty-five percent, and when she took Percocet she got quite a bit of relief for a few hours. (*Id.*) Ludwig said she also sometimes took Flexeril, a muscle relaxant, which eased the pain somewhat. (*Id.*) Ludwig testified that she did not take the Percocet every eight hours because she was afraid of becoming addicted and/or immune to it. (Tr. 50-51.) She reported that the Percocet made her "fuzzy-headed" and the Flexeril made her "quite sleepy." (Tr. 51.)

Ludwig testified that she and her husband lived in a one-bedroom apartment, and their daughter, who was in college, was sometimes there on the couch. (*Id.*) Ludwig stated that she could do a little housework and light cooking, but that she could not unload the bottom rack of the dishwasher and needed to take breaks and lie down often. (Tr. 51-52.) Ludwig continued by stating every once in a while she went to the grocery store but someone else had to push the cart and carry the groceries. (Tr. 52.) According to Ludwig, her father visited occasionally, but she would have to lie in bed or sit on the couch when he came. (*Id.*) Ludwig said she did not go many places because she could not walk far or stand for too long and could drive no more than twenty to twenty-five minutes at a time. (Tr. 52-53.)

Ludwig testified that, at her last job, she had difficulty lifting, putting her hands over her head to reach up and get

charts, walking through the hospital, and reaching across her desk to answer the phone. (Tr. 54.) Ludwig testified to continued numbness in her left hand, her left face, and sometimes her two feet. (Tr. 54-55.) Ludwig said most of the epidural steroid injections did not work at all or worked only for a short period of time. (Tr. 55.) She stated she had a lot of pain in her hip and could not sit for very long. (*Id.*) At home, Ludwig claimed to take baths frequently and to use a heating pad to help ease her pain. (*Id.*) Ludwig stated that she was not able to have the myelogram because she did not have insurance. (Tr. 56.) As to the cervical stimulator, Ludwig testified that, although it moved within six months of placement, she was putting off any adjustment surgery due to her lack of insurance as well. (*Id.*)

Ludwig stated that she needed her daughter or husband to help her get dressed or use the bathroom several times a week because of pain in her upper arms and hands. (*Id.*) She testified that she had trouble standing due to sharp pain in her hip and lower back and that her lower back hurt consistently. (Tr. 57.) Ludwig reported only being able to stand for fifteen to twenty minutes at a time. (*Id.*) She also stated that, when seated, she needed to constantly shift in her chair due to pain. (Tr. 58.) Ludwig testified that she did very little with her

left hand and arm and noted that even applying deodorant was painful. (Tr. 59.)

The VE, Sharon Ringenberg, testified that a hypothetical individual consistent with the ALJ's RFC determination could not perform Ludwig's past work but could potentially work as a cashier, furniture rental consultant, or hand folder. (Tr. 65.) Ms. Ringenberg opined that typical on-task requirements for such jobs are for eighty to eighty-five percent of the day and that typical absenteeism tolerance would be one to two days a month. (Tr. 67.) Ms. Ringenberg also testified that if the hypothetical individual needed to lie down for portions of the day, it would eliminate all of the jobs she had listed. (*Id.*)

*Review of the Commissioner's Decision*

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id*. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety but shall not substitute its own opinion for the ALJ's by

reconsidering the facts or re-weighing the evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for benefits under the Social Security Act, the claimant must establish that she is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five-step evaluation:

Step 1: Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to step 2.

Step 2: Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to step 3.

Step 3: Does the claimant have an impairment or

combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404 Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to step 4.

Step 4:    Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to step 5, where the burden of proof shifts to the Commissioner.

Step 5:    Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); see also *Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Ludwig met the insured status requirements of the Social Security Act through March 31, 2014, had not engaged in substantial gainful activity since November 20, 2009, and suffered from the following severe impairments: cervical degenerative disc disease and degenerative joint disease. (Tr. 24.) The ALJ further found that Ludwig did not meet or medically equal any of the listed impairments. (Tr. 25.) The ALJ determined that Ludwig retained the Residual Functional Capacity ("RFC") to perform a reduced range of light work. (Tr. 26-29.) More specifically, the ALJ found that:

[Ludwig] has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that [she] is limited to occasional pushing/pulling with the left upper extremity; occasionally climbing of ramps/stairs; occasional balancing, stooping, kneeling, crouching, and/or

crawling; [she] can never climb ladders, ropes, or scaffolds; [she] must avoid hazards such as moving machinery, unprotected heights, and slippery/uneven surfaces; and she must alternate between sitting and standing approximately every 30 minutes, but the positional change will not render [her] off task.

(Tr. 26.) With this RFC, the ALJ determined that Ludwig was unable to perform any of her past relevant work but that, given her vocational profile and RFC, she could perform other jobs that existed in significant numbers in the national economy such as the work of a cashier, a furniture rental consultant, or a hand folder. (Tr. 29-30.) Thus, Ludwig's claim failed at both steps four and five of the evaluation process.

Ludwig believes that reversal is required because the ALJ committed several errors. Specifically, Ludwig argues that the ALJ erred by: (1) failing to properly evaluate the opinion of Dr. Drew, her treating pain specialist; (2) failing to adequately consider and address the "other source" opinion evidence of record; and (3) improperly evaluating Ludwig's credibility. Each argument will be addressed in turn.

*The ALJ's Consideration of Dr. Drew's Opinion*

Ludwig argues that the ALJ's determination that Dr. Drew's opinion is entitled to little weight is not supported by substantial evidence. A treating physician's medical opinion must be given controlling weight if it is "well supported" and

not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c); *see Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *Martinez v. Astrue*, 630 F.3d 299, 306 (7th Cir. 2010); *Campbell v. Astrue,* 627 F3d 299, 306 (7th Cir. 2010). Furthermore, SSR 96-2p requires that the ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight and adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

If the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the ALJ must apply the following factors to determine the proper weight to give the opinion:

(1) the length of the treatment relationship and frequency of examination;

(2) the nature and extent of the treatment relationship;

(3) how much supporting evidence is provided;

(4) the consistency between the opinion and the record as a whole;

(5) whether the treating physician is a specialist;

(6) any other factors brought to the attention of the Commissioner.

20 C.F.R. §§ 404.1527(a)-(d) and 416.927(a)-(d); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). It is reversible error for an ALJ to discount the medical opinion of a treating physician without applying this legal standard and for further failing to support the decision with substantial evidence. *Moss*, 555 F.3d at 561; *Punzio*, 630 F.3d at 710.

In the present case, as related to the November 2011 medical source statement from Dr. Drew, the ALJ opined:

> The undersigned gives little weight to Dr. Drew's opinion because it is inconsistent with his own treatment evidence and it is without substantial support from the other evidence of record, which renders it less persuasive. She was relatively pain-free in the left lower extremity with a negative straight leg raise, no edema, and sensation was intact. The evidence does demonstrate an antalgic gait at times and range of motion limitations in the spine and lower extremities. The claimant achieved good pain relief with spinal court stimulators and injections. In addition, the claimant testified to difficulty sitting. As such, the undersigned included a sit/stand option in the residual functional capacity. However, the evidence does not support an ability to lift more than 10 pounds, as the claimant had full range of motion un the upper extremities and she was able to use her hands without problems. She performs household chores, cooks, shops, drives, and walks the dogs, which is inconsistent with the functional limitations given by Dr. Drew. Diagnostic imaging does not support such severe limitations either. She is limited to occasional pushing and pullin on the left because of numbness and tingling noted in the left hand. Dr. Drew indicates that depression and anxiety contribute to the severity of the claimant's physical condition, but during examinations, no mental problems were noted. She was alert and oriented with no aberrant behaviors, and her

memory was intact.

(Tr. 28) (internal citations omitted).  The Court finds that the ALJ's explanation for giving Dr. Drew's opinion "little weight" is insufficient.   First, the ALJ did not offer an adequate explanation or specific reasons as to why Dr. Drew's opinion is "inconsistent with his own treatment evidence."  Throughout the year and a half of treating Ludwig, Dr. Drew noted that Ludwig had severe though fluctuating pain and observed an antalgic gait on eight separate occasions.  Dr. Drew also noted Ludwig had muscle weakness on fourteen separate occasions.  Although the ALJ stated that Ludwig was "relatively pain-free in the left lower extremity" and that she achieved "good pain relief with spinal cord stimulators and injections," this ignored evidence from Dr. Drew's own treatment notes that such relief was temporary and incomplete. In February of 2011, after the spinal cord stimulators were implanted, Dr. Drew noted that Ludwig was experiencing persistent pain and had an antalgic gait, muscle weakness, and a limited range of motion in her lumbar spine.  He recommended reprogramming the spinal cord stimulator.  In November of 2011, Dr. Drew noted Ludwig had back pain as well as pain extending from her left shoulder to her left hand.  The ALJ did not adequately define any inconsistencies related to this evidence.  See *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (an ALJ is not permitted to "cherry-pick" evidence from the record to support a denial of

benefits).

Similarly, while the ALJ stated that Ludwig's performance of household chores, cooking, shopping, driving, and walking her dogs are activities that are inconsistent with Dr. Drew's functional limitations, she did not explain why. Ludwig testified that she did "a little bit" of housework but that she didn't do laundry too often or unload the bottom rack of the dishwasher because she could not bend over. She also testified that she could cook a light meal a few times a week but that she needed to lie down in between her chores. Ludwig stated that she needed someone to push the cart and help her carry the groceries in when she was able to go to the grocery store once in a while, and she also stated that she was only able to drive for twenty to twenty-five minutes at a time. Ludwig clearly testified that she no longer had any dogs but that when she did previously, she was not able to care for them without help. Ludwig noted that she would "try to walk them a little bit" but could never do so for very far. The ALJ seemingly mischaracterized Ludwig's testimony when using it to discount Dr. Drew's opinion, and it is unclear to the Court why this evidence conflicts with the functional limitations given by Dr. Drew. The ALJ's failure to shed light upon this issue constitutes error. See *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (failure to provide an explanation for why a claimant's activities are inconsistent with a treating physician's opinion is

error); *see also Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) (the ability to remain flexible and engage others in help related to household chores and limited activities of daily living is critically different than the requirements of a full-time job)).

To the extent the ALJ determined that Dr. Drew's opinion was entitled to little weight because it was "without substantial support from the other evidence of record," she again failed to offer an adequate explanation or specific reasons for that determination. For example, while the ALJ cited generally to Dr. Rhee and Dr. Kassab's medical records to determine that the evidence did not support an ability to lift no more than ten pounds because Ludwig "had full range of motion in the upper extremities and she was able to use her hands without problems," the ALJ failed to acknowledge or explain evidence in the record to the contrary. Dr. Smith noted that Ludwig had pain in her left deltoid and supraspinatus and could not abduct her arm past thirty degrees. He also documented diminished sensation in her left thumb and index finger. Dr. Kassab himself also documented diminished grip strength in Ludwig's left hand. Because the ALJ did not expand upon her conclusions, it is unclear why she chose to discount this evidence (which seems to support Dr. Drew's findings) and rely on other unfavorable evidence instead. The ALJ's cursory statement that Dr. Drew's limitation

on lifting is not supported by the record, without more, is insufficient to create the sort of logical bridge between the evidence she relied upon and her conclusion that is required. See *Clifford*, 227 F.3d at 872 (an ALJ must "build an accurate and logical bridge from the evidence to his conclusion"). Similarly, the ALJ faults Dr. Drew for indicating that depression and anxiety could have contributed to Ludwig's physical conditions because "during examinations, no mental problems were noted." However, Dr. Cerbin noted that Ludwig seemed depressed, and Dr. Kassab opined that Ludwig's physical symptoms might stem, in part, from depression. In fact, Dr. Kassab went so far as to recommend that a psychiatric evaluation be performed. The ALJ did not address these observations, which are consistent with those of Dr. Drew, and does not elaborate as to why she failed to do so. See *Id.*

Furthermore, while the ALJ cites generally to the records of Dr. Smith, Dr. Rhee, and Dr. Kassab to conclude that Ludwig was relatively pain-free in the lower left extremity with a negative straight leg raise, no edema, and intact sensation, she does not explain why this evidence, when viewed as part of the record as a whole, renders Dr. Drew's opinion substantially unsupported. Dr. Cerbin documented that Ludwig had limited range of motion in her cervical spine, decreased range of motion in her shoulder, and cervical radiculopathy that was not controlled. Dr. Smith documented multilevel degenerative changes in the cervical spine,

painful heel walking, and limited range of motion in her cervical spine. Dr. Rhee documented limited range of motion in Ludwig's neck and back. Dr. Kassab documented that Ludwig had an antalgic gait, difficulty standing on her heels or toes, and diminished motion of the cervical and lumbar spine. The Court agrees with Ludwig that, while the evaluations by the other providers may not have exactly matched the opinions of Dr. Drew, the ALJ did not adequately explain why Dr. Drew's opinions were without substantial support. The ALJ's conclusions, without further explanation, are simply too vague to allow for meaningful appellate review given the record before this Court which is rife with evidence that *is* consistent with Dr. Drew's opinions. See *Id.*; see also *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (an ALJ cannot simply cherry-pick facts from a doctor's findings to support his decision to discount a treating physician's opinion, while ignoring evidence that points to a disability finding).

Finally, even if Dr. Drew's opinion was inconsistent with his own treatment records or not well supported by other substantial evidence, the ALJ did not consider all of the factors set forth in 20 C.F.R. §§ 404.1527(a)–(d) and 416.927(a)–(d) in determining the proper weight to give to his opinion. Specifically, the ALJ did not discuss the length of treatment, frequency of examination, or the nature and extent of the treatment relationship between Ludwig

and Dr. Drew. Dr. Drew had been examining Ludwig regularly from April of 2009 through November of 2011, long enough to create an extensive doctor/patient relationship. As explained by the Seventh Circuit, failure to address these factors constitutes reversible error. *Moss*, 555 F.3d at 561; *Punzio*, 630 F.3d at 710. Given the narrow range of work that the ALJ found that Ludwig could perform, it is reasonably likely that any further limitations in her ability to lift, reach, sit and stand could have further eroded the occupational base to such an extent that she would be deemed disabled within the meaning of the Social Security Act. Thus, this case must be remanded so the treating physician's opinions may be properly addressed.

*The ALJ's Credibility Assessment*

Ludwig also argues that the ALJ failed to properly evaluate the credibility of her allegations. Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)

(citing *Clifford*, 227 F.3d at 872). Instead, the ALJ must make a credibility determination that is supported by record evidence and is sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight given to the claimant's statements *and the reasons for that weight*. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003)(emphasis added).

In evaluating the credibility of statements supporting a Social Security application, an ALJ must comply with the requirements of Social Security Ruling 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). This ruling requires that ALJs articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

1.  The individual's daily activities;

2.  The location, duration, frequency and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effect of any medications the individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, the
        individual receives or has received for
        relief of pain or other symptoms;

6.      Any measures other than treatment the
        individual uses or has used to relieve pain
        or other symptoms; and

7.      Any other factors concerning the
        individual's functional limitations and
        restrictions due to pain or other symptoms.

SSR 96-7p; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915–

16 (7th Cir. 2003).

Here, the ALJ discounted Ludwig's allegations by stating:

At the hearing, the claimant alleged that her cervical
spine stimulator "moved" six months after implantation
and essentially "stopped working" 1 ½ years ago, but
she has not returned to the doctor to address this
issue for a year and a half, which is inconsistent
with her allegations of debilitating pain. She is
apparently able to successfully use hot baths, heat
pads, and neck massagers as pain remedies. In
addition, the claimant continued to smoke against her
doctor's advice, which interferes with healing.

(Tr. 27.) The record is clear though, that Ludwig continued to

visit Dr. Drew for treatment of her severe pain throughout the

adjudicative period, a fact the ALJ did not acknowledge. While

there is no evidence that Ludwig specifically mentioned her

suspicions of movement to any doctor, she did testify that she

was not able to have her cervical stimulator surgically adjusted

because of a lack of medical insurance; the ALJ made no mention

of Ludwig's insurance difficulties. The ALJ did, however, point

to Ludwig's declaration of "successfully" using at home remedies

of hot baths, heat pads, and neck massagers for pain relief as being inconsistent with her statements concerning the intensity, persistence, and limiting effects of her pain. Not only did the ALJ mischaracterize Ludwig's testimony by using the word "successfully" in relation to her alleged pain relief, but she also did not adequately explain why Ludwig's use of at home remedies, in addition to the treatments prescribed by her physicians, would render her allegations of pain incredible. See *Clifford*, 227 F.3d at 872 (an ALJ must "build an accurate and logical bridge from the evidence to his conclusion"); see also *Scott v. Astrue*, 647 F.3d at 739 ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce.").

Furthermore, as explained in more detail in the previous section, while the ALJ did discuss Ludwig's individual daily living activities, she cherry picked from the details, leaving out important factors related to Ludwig's ability to perform these daily tasks; she did the same with regard to the effectiveness and duration of Ludwig's various pain relief and surgical procedures. This was improper, and remand is required. See *Scott*, 647 F.3d at 740 (an ALJ may not "cherry pick" from mixed results in order to support a denial of benefits).

*The ALJ's Consideration of "Other Source" Evidence*

In light of the ALJ's other errors described above, the Court finds no compelling reason to explore this argument. On remand, in addition properly considering evidence related to Dr. Drew's opinions and Ludwig's credibility, the ALJ will also need to consider all relevant "other source" opinion evidence of record.

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

**DATED: March 26, 2015**          **/s/ Rudy Lozano, Judge**
                                   **United States District Court**